Tilghman C. J.
not having been present at the argument, gave no opinion.
Gibson J.
The depositions of Hugh Martin, and James White, were properly rejected. The ostensible object of the defendant, was, to shew acts done by James Simpson, in prosecution of the title; and these, provided the best evidence of them were offered, would unquestionably be competent. The best evidence would have been, the application itself, filed in the land office, or a certified copy, and also the originator a certified copy of the certificate, to exonerate from the payment of interest. It was necessary to prove the contents of these papers, before the nature of the acts done could be ascertained, which could not be done by parol. But the papers being exhibited, ,the defendant might have given in evidence, the acts and declarations of Simpson, at the time, to explain his object and meaning. On the other hand, the depositions of John Gibson and others, excepted to by the defendants, were properly admitted, for they went to prove the declarations of Simpson, and were evidence against those claiming under him.
At the trial, it was material to ascertain, whether the warrant under which both parties derive title, was taken out for Agnes, the daughter of Andrew Simpson, from whom the plaintiff claims, as brother of the half blood j or for Agnes, the daughter of James Simpson, from whom the defendant claims by purchase. Andrew Simpson, was the owner of a small improvement on the land in dispute, which, it is acknowledged, did not vest a spark of title in him. After his death, this warrant was taken out by his brother, James Simpson, in the name of Agnes Simpson. It seems, the purchase money was advanced by Mary Wallace, the-sister of Andrew and James, It was contended, this advancement was made in behalf of Agnes, the daughter of Andrew, on account of a horse, left by her mother in possession of the husband of Mrs. Wallace, for the price of which she supposed his estate was liable. It was proved by the evidence of Mrs. Wallace, (now Mrs. Barr,) that James Simpson reimbursed her the money so advanced 5 but, without stating when, or *341 whether it was on behalf of his daughter, or his neice. On this part of the. case, the Court gave in charge to the that if this payment was made after the date of the warrant, and much more, if it was made for the purpose of creating a title in himself, to a warrant originally intended for the exclusive benefit of his neice, it was entitled to no weight. Now to test the correctness of this opinion, it is only necessary to observe, that the title vested in somebody at the date of the warrant; and, if in the daughter of Andrew, no act after-wards done by James Simpson, could divest it; and his acts, not done in prosecution of the vesting of the title, could have no operation in his favour. But though these acts could not have that operation, it is said they ought to have had weight in rebutting the presumption that the advancement was made by Mrs. Wallace, in favour of the daughter of Andrew, on account of her claim for the horse, and to shew, that in fact the title never had vested in her. But this is the same in principle; a party may give in evidence, his own acts done at the time; but separate acts done afterwards, can have no operation in his favour. Here the question was, for whom did James Simpson, take out the warrant? Down to its date, his acts and declarations were proper to shew for whom he intended it; but acts done at a period to which the question does not relate, could have no effect. If the rule were otherwise, a party might make what evidence he pleased in his own favour. At the period of the payment to Mrs. Wallace, James Simpson may, for the first time, have entertained the design of making the land his own, by setting up' his daughter as being the original warrantee, and a trustee for his use; and a payment obviously made to favour that design, if after the date of the warrant, could not be urged by him or any one claiming under him.
But a much more important question arises under the intestate act of 1794. By the 11th section it is enacted, that where any person shall die seised, leaving no children, &c. of the whole blood, then brothers and sisters of the half blood shall inherit in preference to more remote kindred, “ unless where such inheritance came to said person so seised, by de* scent, devise, or gift, of some one of his or her ancestors, in which case all those who are not of the blood of such ancestor shall be excluded from such inheritance.” If therefore, Agnes, the daughter of Andrew, took the land by descent *342 from her father, tbe defendant as heir at law ex parte paterna, would be entitled. On the other hand, if she acquired ^ land by an original purchase, the plaintiff her half brotber by the mother’s side would be entitled. The facts are, that Andrew Simpson, who was killed by the Indians in 1776, was the owner of an improvement on the land in dispute. There was no settlement, nor does it appear, the improvement was made animo residendi; and it is not contended he had a title on which an ejectment could have been maintained ; or that he had any vested interest which the law recognises. On the 22d of November, 1785, James Simpson took out a warrant for Agnes Simpson, to include this improvement. This reference to the improvement as the commencement of the title, must have arisen from abundant caution ; but a party shall not be precluded from disclaiming to hold under an improvement, because, for fear of jeopardising his title, he chooses to pay interest to the state from the commencement of his improvement. Assuming then, that the warrant was intended for Agnes, the daughter of Andrew, the question will be, whether the land came to her by descent from her father, within the 11th section of the intestate act, or, by original purchase from the commonwealth. The clear object of this section, was to let in brothers and sisters of the half blood, and yet to prevent property coming from an ancestor, for which a valuable consideration was not paid by the heir or donee from passing out of the blood of such ancestor; and nothing could be more reasonable than that a transfer, made either by the act of the party, or the operation of law, and which was merely gratuitous, and in consideration of consanguinity, should continue no longer than the consideration lasted, and that, instead of going to strangers to the consideration, the’property should revert to the blood of the ancestor from whom it moved. Where therefore the ancestor had the estate clear of incumbrances, there can be no difficulty. But it becomes almost impossible to fulfil the intention of the legislature, where the ancestor had not the whole property in the thing; as where land was articled to be purchased, and none, or but a part of the purchase money was paid by the ancestor; or where incumbrances to the full amount of the value had been discharged by the heir, with funds acquired by his own industry ; this, in substance and effect, would be a new purchase. But although in such *343 case the reason would not hold, I am not prepared to say the estate would not be considered as having come on the part of Such ancestor. It is however, not the case before us. But a stronger case would be, that of land incumbered by an ancestor, say a father, and the incumbrance paid oif with funds derived from the mother; here, though the property ostensibly would have come on the part of the father, yet it would have substantially come on the part of the mother. On the other hand, where land is purchased with money derived from an ancestor, the land will not, for that reason, be considered as having come on the part of such ancestor; for though in equity money of an infant laid out in land, is still to be considered as money, yet the reason of that is, because of the different ages at which an infant may dispose of real and personal estate, and not out of favour to any one representative more than another. Peirson v. Shore, 1 Atk. 480. For this reason, I apprehend that the circumstance of Agnes, while an infant, having purchased the warrant with funds derived from her father, cannot strengthen the defendant’s case, and even if the land should be considered as money, it would not be within the provisions of this section, which relates to the realty only. I do not mean to express an opinion on the cases I have put; they must arise before long, when it will be time enough to decide them; but I mention them to shew how difficult it is to day down any general rule, that will, in all cases, completely effect the object of the legislature; and to shew the danger of carrying the construction beyond the letter to provide for an apparent, equity, or to obviate - the hardship of a case. Establish what rule we may, its operation will produce hardship in some instances, and thwart the intention of the legislature. What rule of construction can effect it, where the land has been paid for in part by the ancestor, and in part by the heir out of his own funds ? The half blood must take all or none. I have no doubt the motive that actuated James Simpson, in taking out this warrant in the name of Agnes, was her being the daughter and heiress of his brother Andrew, and that he considered her as having a claim, at least in point of conscience, on the score of her father’s improvement, and, that had he supposed the land on her death would have gone out of the family, he would have acted differently. But would not a gift of land made by him for the same consideration be a new *344 purchase, the ancestor of the donee having had no interest? Certainly consanguinity to a particular person, being the meritorious cause of a gift, will not be equivalent to a derivation of the estate from such person, although it is reasonable, that a stranger to the consideration should not enjoy a beneficial interest under the gift; and yet, in such case, a stranger might take. Such, in effect, is the case here ; except that this is stronger than a gift from James Simpson; for only his trouble in managing the business was gratuitous, the purchase money being paid by the warrantee with her own funds. It is going far enough towards effectuating the intention of the legislature, to say the ancestor must have had some vested interest in the land, equitable or legal, not resting for its continuance on the good will of the owner of the fee, but one which the law will acknowledge and protect. Cases of leases bear some analogy. In England, the right of renewal, as it is improperly called, cannot be insisted on in a court of law, or equity, there being no obligation on the part of the landlord to renew, but the constant habit of re-granting the land to the same person, at the expiration of the lease, has created a kind of ideal interest beyond its termination, which men have considered as if it were real. Hence where a trustee, guardian, or executor, availing himself of his situation, gets a renewal of a lease for his own benefit, equity will make him a trustee for the person beneficially interested in the old lease, 4 Wils. Eac. Ab. 221. But this is done, not on the ground of some spark of equity, or ideal right, in such person, predicated on, and connected with a preceding interest, but on the ground of public policy, which forbids a trustee, guardian, or executor, to derive any benefit for himself; the cestui qui trust, or ward, being entitled to all the benefit resulting from his acts. But the case of Peirson v. Shore, 1 Atk. 480, is, in principle, exactly our case. A, who had a bishop’s lease to her and her heirs for three lives, devised the same to her infant daughter, and directed the guardian and trustees, to make purchases for the infant’s benefit. On the decease of one of the three lives, the guardian took a new lease for three lives; the infant died; and it was held by the Chancellor, that this being a descendible freehold, if nothing had been altered, it would have gone to the heirs on the part of the mother. But the new lease was to be considered as a new acquisition by purchase, just as if the infant had lived *345 to full age, and had then surrendered the old lease, and had taken a new one; or as if all the lives had fallen in and the guardian had renewed the lease; in all which cases, it would have been considered a new purchase, and would have gone to the heirs, ex parte paterna. In Mason v. Day, Prec, in Chan. 319. 1 Atk. 481. there is the same point. A feme purchases a church lease to her, and her heirs, for three lives, and dies, leaving an infant daughter; two of the lives die; the infant’s guardian renews the lease; this is a new purchase and shall go to the heirs on the part of the father. The rule is, that a guardian or trustee may change the nature of an infant’s estate, under particular circumstances, as where it is manifestly for the benefit and convenience of the infant; or, whenever a Court of Chancery would do it. Inwood v. Twine, Amb. 419. Viewing James Simpson, in the light of a guardian, it is evident the purchase was for the benefit of Agnes, for without it, the land would have been lost for ever. In fine, I do not see how it is possible an estate can descend or come by devise or gift from an ancestor who had no title to it, equitable or legal, which would be recognised in a court of justice. It may be, where the title is in the ancestor, and the land comes to the heir incumbered, or charged to the amount of its full value, that the discharging it out of funds coming by another ancestor, or acquired by the heir himself, shall not be considered as a new purchase for a valuable consideration ; and even this is a hard case and going beyond the object intended to be secured by the legislature, but perhaps inevitably arising from the necessity of having a rule adapted to all cases. But I would not go further, and say where the ancestor had neither title nor beneficiary interest, he should nevertheless be considered as having transmitted the estate to his descendant. I am of opinion, the judgment ought to be affirmed.
Duncan J.
The fact which Agnes was intended by the warrant, was properly submitted to the jury. The question, whether, if the jury should find that Agnes, the daughter of Andrew, and not Agnes, the daughter of James, was the person in whose name, and for whose use the warrant was taken out, she took the estate ex parte paterna, or as a new purchase or acquisition, was a question of law, and as such, was properly decided by the Court.
The father, Andrew, did not die seised; he neither had the legal estate, nor a right in equity tp call for it; he had *346 neither jus in rerti, nor ad rent. It was at best but a bare curtesy, but it was such a curtesy, as is entitled to some respect; ' and if James had taken out the warrant in his own name, with the money of Agnes, the daughter of Andrew, and dated it back to the improvement of Andrew, I should be disposed in that case, to consider him a trustee for her; acting as her guardian; and to support this, I think there are both reason and authority. 4 Bac. (Wils. edit.) 222. (Of the renewal of leases, by tvhom, and for whose benefit.) In treating of leases by a church, or other corporation, it is said, it has happened in those cases, as in many others, that long indulgence, has been made a ground of claim; a preference repeatedly given, has been insisted upon in process of time, as a prescriptive right, and attempts have been made to enforce that as a right, which was in truth, a pure voluntary curtesy. But though such attempts have failed of success, there being as between landlord and tenant, abstractedly from any express contract to that effect, no obligation on the former to renew with the latter, yet the almost invariable recurrency of the grant to the same object has begotten an idea of something like property, and men have been so far from treating this ulterior interest as precarious, that they have acted upon it as if it were fixed and certain. The tenant’s right as it is called is recognised and protected by Courts of Equity in many instances. Hence, when a trustee, executor, or guardian, avails himself of his situation, and gets a renewal of a lease for his own benefit, the Court will direct it to be for the use of the cestui qui trust. For some time I hesitated whether in conformity to this principle, James, acting on behalf of Agnes, Andrew’s daughter, an infant, and making her father’s improvement the foundation of the purchase from the state, it would not enure to her, not as a new acquisition, but in contemplation of equity, as an estate coming to her on the part of the father; it not being in the power of any one acting on behalf of an infant, by his own act, to alter the nature of the succession. But tracing up the doctrine on this subject to i«s source, it will be found, that this is not universally the case ; for where the act has been for the benefit of the infant, in many cases Courts of Chancery will consider it as if done by the infant, and as if done by him when of full age, and when he had capacity to act. But it must not be a capricious alteration of the estate, •it must be an act done for the benefit of the infant, and not solely with a view to alter the succession ; for then it would *347 be a fraud on the heirs, representatives of the infant, and be void. Now no act could be more beneficial to Agnes, than this act of the' uncle, in taking out the warrant for her. If he had not done so, the land would have been lost to her, and to her heirs, and to the heirs claiming it as an estate descending on the part of her father. No injury was done to them, for they had nothing to lose. No succession was changed, for there was no estate to which they could succeed. On this principle, many cases have been decided. A bare trustee cannot alter the nature of the trust, so as to make it vest in different persons, by his act, than it otherwise would have done, Furlam v. Sanders, 7 Bac. (Wils. edit.) 153. Witter v. Witter, 3 P. Wms. 99. But however in general true this may be, yet the succession may be even changed, where the act is manifestly for the infant’s benefit at the time. Rooh v. Warth, 1 Ves. 461. Tullet v. Tullet, Ambl. 370. Inwood v. Twyne, Id. 417. Mason v. Day, Pre. in Ch. 319. Where a feme purchased a church lease, to her and her heirs, for three lives, and died, leaving an infant daughter ; two of the lives died, and the guardian renewed the lease; it was holden, that this renewed lease was a new acquisition, and should go on the part of the father. So in Pierson v. Shore. 1 Atk. 480. A, who had a bishop’s lease, to her, and to her heirs, during three lives; devises the' same to her daughter, an infant, and directs the guardians or trustees, to make purchases for the infant’s benefit. The guardians, on the decease of one of the three lives, took a new lease for three lives; the infant died. The lease shall go to the heirs-of the infant ex parte paterna, for this is a new acquisition. In that case, it was objected, that this was an act, done by a guardian only during the minority, and ought not to prejudice any who take by representation, it being an act merely voluntary, and not of necessity. How much stronger then this case, where there was no subsisting interest in the infant, and where the act was of absolute necessity. But the Court say, here one life being dead; surrendering the old, and taking a new lease, was the most beneficial purchase for the infant that could be, and therefore ought to have the same consequences as if done by the infant herself, at full age, and go to the heirs, ex parte paterna. This then is to be considered as an estate which Agnes takes as a purchaser,- and not by descent from her father, and consequently goes to her own heirs.
Judgment affirmed-.